Judge Ewing- delivered
the Opinion of the Court.
Thomas Colston, of Virginia, by his last will, directed that a certain portion of his estate should be sold by his executors, and the proceeds divided among certain legatees. The children of Sarah Holladay, wife of Benjamin Holladay, were entitled to one share of those proceeds.
About the year 1805, Benjamin Holladay, who, with his wife and children, was then living in Kentucky, went to Virginia to obtain some portion of this legacy— his children being minors.
Some friends were willing to become his sureties, upon the executor advancing some four or five hundred dollars, to buy some slaves. The executor made the advance of five hundred dollars, in the purchase of three slaves, which were delivered to Benjamin Holladay; and he, with the aforesaid friends as his sureties, executed bond to the executor, for the five hundred dollars, and executed a deed of trust to one Charles Hampton, which recited that the slaves were purchased with the funds of the Colston legacy, and were for the benefit of Sarah Holladay’s children. The deed of trust was never recorded in Kentucky.
Benjamin Holladay, having brought the slaves to this State, remained in possession of them until his death, which took place after the commencement of this suit, with the exception of a week or so, during which time those of them now in contest were in the possession of Stephen Holladay.
In the fall of 1825, Yancy, the complainant — having married one of the daughters of Sarah and Benjamin Holladay, and having claim, in right of his wife, to a portion of the Colston legacy, and being authorized to *231 act for others of the children, by power of attorney— went to Virginia, and collected his own entire share of that legacy in money, as well as the entire shares of his constituents.
Previous to this, William Holladay, one of the children, had died, without lineal descendants, and on Yan-cy’s return, Benjamin Holladay, the father, administered on his estate, and gave a power of attorney to Yancy to collect that share; and Stephen Holladay, another of the children, having also given him a power to collect for him — he, with these powei*s, and perhaps some others, made another trip to Virginia, in December, 1825. The executor now determined to have the bond of five hundred dollars, executed to him by Benjamin Holladay and sureties, discharged; so he, in the settlement with Yancy, paid it in part, by retaining William Holladay’s share, and paid the balance by retaining the amount out of the share of Stephen; and sent the bond to the principal obligor, Benjamin Holladay, to whom it was delivered by Yancy upon his return. Yancy, also, brought with him, on his return, Colston’s will and the deed of trust.
When Stephen Holladay was informed that a portion of his legacy, of about two hundred dollars had been applied towards the discharge of this bond of his father, he became much dissatisfied; and to settle the claim, and quiet him, and perhaps in payment of another claim against his father, the latter, in May, 1826, executed to him a bill of sale for one of the trust slaves — Nancy and her child Booker, reserving to himself and wife the use of them during their lives; and Yancy and Owen Holla-day were subscribing witnesses to the same.
Afterwards, in 1828, Benjamin Holladay executed another instrument of writing to Stephen, releasing all right to the possession, as well as use for life, of said slaves, and Owen Holladay became a subscribing witness to it. And, on the 5th of January, 1832, Stephen made a bill of sale of the two slaves, also of Mary (born after his purchase from his father,) to Yancy; by which he sold to him, all his right, title and interest in the same, after his father’s and mother’s death. In a few *232 months thereafter, he died, and Owen Holladay administered on his estate; and having purchased out the interest of several of the other children, and also of Yan-cy, in the whole of the trust slaves, and received from them a quit claim bill of sale — he set up claim to Nancy and her children — he and his father being in the joint possession.
A court of equity has jurisdiction of a bill filed by a compl’t, qma title to the re-Kfe'estot^in a slave, charging a tween^nadver-sary claimant & the tenant for life, to send the slave out of his reach, and praying for a settlement of the conflicting claims , and that his title may be secured.
So, also, where the property in dispute, is held in trust, and the comp’t asserts title as a beneficiary under the trust.
The act of 1748 —the only one, in 1805, that required deeds of trust of slaves to be recorded — declares that, unless they are recorded as the act directs,they shall be void as to ere ditors and subsequent purchasers: vet — tho’ such a deed not recorded, may be void at law, equity will hardly treat it as a nullity at the instance of a purchaser who purrhased with notice of tho trust; but will ra ther consider him as holding the property, in the place of the trustee, for the uses of the trust.
*232 Yancy filed his bill against them, asserting title, and alleging an apprehension that they might be run off, or otherwise disposed of. Owen answered, asserting title, and making Benjamin Holladay a party to a cross bill; who answered the original and cross bills — siding with Owen, and resisting the claim of Yancy.
The Circuit Court dismissed Yancy’s bill absolutely, and he has brought the case to this Court for revision. Yancv has unquestionable right to relief to some ex- ” T . . 7 . extent. JNor can we doubt, that a court ot chancery qaq jurisdiction, under the circumstances of the case, Yancy held only an interest in remainder, to take ef-a^ter ^ death °f his father and mother-in-law, who, in conjunction with Owen, the administrator of Stephen, held the possession, and the latter was assert-
ing right to the property, adverse to the remainder of Yancy, while as administrator of Stephen — if his absolute purchase was valid — Owen had a right to hold the possession of the slaves during the life of his father and mother, which interest had not been disposed of by Stephen to Yancy. Besides, Owen claimed under the trust. Yancy, in right of his wife, if he had not parted with it, was interested in the trust, and if he had parted with that interest, at least he had a right to be substituted in the place of Stephen, and to assert the equity which Stephen had a right to assert in the trust property. So that, in any aspect of the case, he was without remedy at law, and had a right to file a bill of quia timet to assert and establish his right to the property.
We place out of the case, the paper exhibited, purporting to be a release executed by Owen to Stephen; also, the fact charged, of incompetency on the part of Stephen, to make a contract. Neither the release, nor the charge of incompetency, is sustained by proof.
A money legacy was bequeathed to a family of children, by the father of their mother. During their minorities, their father obtained a portion of the fund from the ex’or, in Va. which, with the executor’s concurrence, was invested in slaves, for the use of the family, and the father, thereupon, gave the ex’r a refunding bond, and also executed a deed to a third party, declaring the trust for which he had ■ received the money and purchased the slaves:— the legatees have an election, to insist, each for himself, either upon payment of his share of the legacy, in money, by the executor, or to take an interest in the slaves- But those who require and receive money, thereby renounce all interest in the slaves; and those who assert claim to the slaves, must make a corresponding abatement of their claims to the money.— And though a legatee, who has received his money without knowing of his right to take an interest in the slaves, may not be precluded by that, he may be by subsequent acts, as by standing by, after acquiring a knowledge of his right, and seeing the father sell the slaves; and his attestation to the bill of sale, would be persuasive, if not conclusive, evidence of renunciation.-All the surviving legatees, the representatives of such as have died, and the trustee, are necessary parties.
Though the statute of 1748 (which was the only statute, in 1805, requiring a deed of trust for slaves to be recorded,) declares all deeds of trust and mortgages void as to all creditors and subsequent purchasers, that shall not be recorded as required by the act, it may be well questioned whether a court of chancery will treat such a deed as a nullity, at the instance of a purchaser, who purchases with notice of the trust. The object of the record is to give notice, and if a purchaser buys with full knowledge of the trust, though the deed may be void at law, and as a mere legal conveyance, his conscience would be affected by the notice; and in all good conscience, it would seem right and consistent with the principles of equity, to make him occupy the condition of the trustee, and to regard him as holding the property in trust for the uses of the trust. Morton vs. Roberts, 4 Dana, 260.
But it matters not whether the deed in question be void or not. It is clear that the slaves were purchased with' the funds of the children, and were placed in the hands of Benjamin Holladav to be held in trust for them; that he did, in fact, hold them in that character, and so declared on repeated occasions; and we cannot doubt that Stephen knew, at the time of the execution of the bill of sale, the true condition of the slaves, and that Yancy and Owen also were then fully apprised of it.
Being purchased with their funds, or the funds of the Colston legacy, to which, they were entitled, they had an equitable interest in them, which they might assert if they chose, or claim the legacy in money, disaffirming the purchase, and disclaiming all interest in the slaves.
They, or any of the children, were not bound to take the slaves in lieu of the money legacy. But might have disaffirmed the purchase, and demanded from the execu *234 tor their several legacies in money. Or they had a right to recognize and affirm the purchase; in which event they would have a right to assert, severally, their interests in the slaves. But in the event of a recognition of the purchase, and assertion of claim in the slaves, they could claim them only upon the terms of discounting from their money legacy, the consideration paid for them, or paying and satisfying the bond of Benjamin Holladay to the executor.
If, therefore, with a full knowledge of their rights, any of the children exacted from the executor the full amount of his proportion of the legacy in money; such exaction and payment would amount to a disclaimer of the purchase, and a renunciation of all equity in, or claim to, the slaves. In which event, a court of chancery would not indulge such child in setting up any claim to the slaves.
And even if the money was exacted and paid to any of them, without a knowledge of their rights, other acts, after the true state of their interests was known, might be regarded by the Chancellor, as a waiver or renunciation of their claims in the slaves. Standing by, after a knowledge of the title, and permitting Benjamin Holla-day to sell, and execute a bill of sale, for any of the slaves, or any other instrument evidencing a transfer of title, and testing such bill of sale or other instrument, should be regarded as very persuasive, if not conclusive, evidence of a renunciation of all equity or claim to the slaves, to which such party might have been entitled at the time of such act.
But these matters cannot be conclusively determined •at this time, as all the heirs or their representatives, and the trustee in the deed of trust, are necessary parties, and their rights should not be settled until they are brought before the Court.
If such acts of renunciation have taken place on the part of all the children, or those claiming under them, except Stephen and Benjamin Holladay, (the last of whom had a right to the interest of William, the deceased son,) then the Court would be justified in decreeing the slaves in contest to Yancy absolutely, as Sarah and Benjamin Holladay are both now dead.
l'he refunding having ^beenTat-jsfied to the ex’r,. by his retaining the entire share of one legatee (which had descended to the fa tiler) and part of another,-the trust results first to them, or they (who are entitled to those legacies) have, to that extent, a lien on the slaves. The legatee whose share was so applied, and who has not had the use of any of the slaves, is entitled to interest. The other, who has had the use of the slaves, is not.
The father having sold one of the slaves (in the case supra) to his son, who sold it again with war ranty,the equitable interest and lien of the father, as well as all the interest of the son, inures to the benefit of the pur chaser from the latter. And if the interest of the other legatees in the slaves can be secured, without affecting innocent purchasers, it should be so-ordered.
But in case no acts shall be made out, evidencing a renunciation on the part of any of the children, then will each of them, who has not so renounced, have a right to present his claim to the slaves, and have it allowed upon equitable terms. And we will here present some suggestions that may aid the Circuit Court, in the further progress of the case in this aspect of it.
The bond of Benjamin Holladay to the executor, was paid wholly out of the legacy of William, which belonged to Beniamin, and the legacy of Stephen. The ° . , . J , . _ , r. • trust m the slaves, therefore, first results to Benjamin and Stephen, to the extent or value of the sums so paid, or each of them has a lien upon the slaves for the full amount of the sum abstracted from their part in the payment of said bond; and afterwards, to stand upon an equality with the other children in the division.— Stephen has also a right to interest upon the amount of his legacy which was so applied, if he did not receive an equivalent in the use of the slaves. Benjamin, if he enjoyed the use of the slaves,'should not have interest.
And, as Stephen purchased the slaves in contest from Benjamin, and warranted the title, Benjamin’s whole equitable interest and lien on the slaves, at least to the extent of giving security to the title derived from him, inures to the benefit of Stephen’s purchase; and as Yancy purchased from Stephen, he stands in his place, and the whole lien and interest of both Benjamin and Stephen, to the extent of giving validity and security to his - title, inures to Yancy’s benefit. And if the other children can be secured in their full shares or interest, out of the other slaves, (if they be entitled to any,) without affecting the rights of innocent purchasers, it should be done, and Yancy left to the full enjoyment of those derived by his purchase from Stephen. Yancy, by his quit claim bill of sale, without warranty, only parted with the interest which he was then entitled to, and not to any subsequently acquired interest.
These suggestions are made, without intending them to be conclusive, as the case in its further progress may be made to assume a different aspect.
It is, therefore, the opinion- of the Court, that the de *236 cree of the Circuit Court be reversed, and the cause remanded, that the proper parties may be made, and further proceedings be had. And the plaintiff in error is entitled to his costs in this Court.